**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NATHAN ANTOINE, N–40028,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **Case No. 16 C 9568** |
| | ) | |
| **RANDY PFISTER, Warden, Stateville** | ) | **Judge Rebecca R. Pallmeyer** |
| **Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On September 28, 2000, a Cook County jury convicted Petitioner Nathan Antoine of two counts of aggravated criminal sexual assault. Antoine was sentenced to two consecutive 60-year terms of imprisonment. He has exhausted his state appeals and now seeks a writ of habeas corpus from this court under 28 U.S.C. § 2254. Petitioner asserts 12 grounds for relief, including ineffective assistance of trial counsel, ineffectiveness of appellate counsel, and an alleged violation of his right to access exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). As explained below, each of Petitioner's these claims is procedurally defaulted. His petition for a writ of habeas corpus is denied, and the court declines to issue a certificate of appealability under 28 U.S.C. § 2253(c).

<u>**BACKGROUND**</u>

**A.      Factual Background**

Absent clear and convincing evidence to the contrary, the court presumes the "state court's account of the facts [to be] correct." *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). The facts set forth here are derived from the last state court opinion on the merits, *People v. Antoine*, 335 Ill. App. 3d 562, 781 N.E.2d 444, 269 Ill. Dec. 647 (1st Dist. 2002) (affirming Petitioner's convictions on

direct appeal),[1] and otherwise, where noted, from the record itself. (*See* SCR, Exs. A-Q [28-1 to 28-17].)

On March 15, 1997, around midnight, Rose B. stopped at a Jewel grocery store on her way home from work. (2002 Direct Appeal Order at 1.) When she returned to her car, she saw a car parked nearby with a man sitting in it. (*Id.*) Rose B. placed her groceries in her car and drove away, but soon realized she was driving on a flat tire and pulled over. (*Id.*) When Rose B. opened the trunk of her car, a man she later identified as Petitioner pulled over and offered to help. (*Id.* at 2.) A special lug wrench was needed to change the tire, and Rose B. did not have one. (*Id.*) Petitioner offered to drive Rose B. back to Jewel so that she could call a friend, and Rose B. accepted the ride. (*Id.*)

But Petitioner did not drive Rose B. back to Jewel. (*Id.*) Instead, he drove to an alley and stopped the car. (*Id.*) He unzipped his pants, forced Rose B.'s head down, and said "suck it or I'll cut you." (*Id.*) Rose B. told Petitioner that she was 72 years old and begged him not to force her to perform oral sex on him. (*Id.*) She also felt a cut over her right eye and wiped blood onto Petitioner's pants. (*Id.*)[2] After Petitioner tried, unsuccessfully, to force anal sex on Rose B., he instead pushed her head into his lap and ordered her to perform oral sex on him. (*Id.*) She complied and Petitioner ejaculated. (*Id.*) Petitioner then drove down the alley while ordering Rose B. to keep her head down. (*Id.*) Approximately 15 minutes later, Petitioner stopped his car, ordered Rose B. to get out and threatened to shoot her if she looked at him. (*Id.*) He refused to give Rose B. her purse and, after she got out of the car, drove away. (*Id.*)

Rose B. sought help at a nearby home, and the homeowner called the police. (*Id.*)

---

[1]     This opinion is attached to the State Court Record ("SCR") as Exhibit A [28-1], and the court refers to it herein as "2002 Direct Appeal Order." The Appellate Court of Illinois has issued several subsequent opinions in Petitioner's case, but the opinions either quote or paraphrase the facts from the 2002 Direct Appeal Order.

[2]     The record does not indicate that Petitioner's pants were introduced in evidence.

Paramedics arrived at the home and transported Rose B. to a hospital, where she was treated with a sexual assault kit. (*Id.*) The treating nurse collected Rose B.'s pantyhose and took oral and rectal swabs. (*Id.*) While she was at the hospital, Rose B. told a police officer what had happened. (*Id.*) Her car was recovered, and an evidence technician located fingerprints on several areas of the car, photographed them, and lifted them. (*Id.*) He also discovered a puncture hole on the side of the flat tire. (*Id.*)

Later, an expert in latent fingerprint identifications and comparisons "made a tentative, but not complete, identification that the latent impression belonged to Antoine." (*Id.*)[3] Rose B. had told police that "the assault took place in a small dark-colored, two-door car with passenger front-end damage." (2002 Direct Appeal Order at 9.) Petitioner's "neighbor confirmed that [he] drove a car fitting that description, and officers saw a car fitting that description in [Petitioner's] garage." (*Id.*) In addition, "a maroon, two-door Chevy compact was registered to [Petitioner's] home." (*Id.*) Based on this information, Detective William Villanova obtained an arrest warrant for Petitioner and a warrant to search his home. (*Id.* at 2, 9.)[4] Police officers arrested Petitioner on March 19,

---

[3]      The 2002 Direct Appeal Order does not state how the police had Petitioner's fingerprints for purposes of comparison. In his Petition for Writ of Habeas Corpus, Petitioner states that at the time, he was a "known felon" and his fingerprints had previously been entered in the "Automat[ed] Fingerprint Identification System" ("AFIS"). (Petition for Writ of Habeas Corpus ("Habeas Petition") [13], at 23.) According to Petitioner, the latent fingerprints from the crime scene in this case "initially could not be matched through the [AFIS] which resulted [sic] a negative on March 15, 1997." (*Id.*) In his initial pro-se petition for post-conviction relief, Petitioner asserted that the police did not have any leads on a suspect until March 18, 1997, when it obtained information from "the husband of a woman" whom Petitioner was convicted of assaulting in 1982. (*Pro Se* Post-Conviction Petition, Ex. H to SCR [28-8], at C000198.) That same day, Petitioner asserts, the police obtained an arrest warrant based on the "supposedly tentative fingerprint match" referenced in the 2002 Direct Appeal Order. (*Id.*)

[4]      The 2002 Direct Appeal Order does not specify what evidence was recovered in the search. Petitioner states that police did not recover any of the evidence identified in the warrant, such as Rose B.'s purse or a knife. (*See* Habeas Petition at 29.) According to Petitioner, however, the police obtained "bed sheets, pillowcases, clothes that was [sic] not used for any purposes," "a bag of laundry room garbage," and "other personal property items." (*Id.* at 29-30.) The garbage bag, Petitioner contends, contained "a used condom which was saturated with [his] semen which was used to taint, tamper with and alter" forensic evidence used against him. (*Pro-Se* Post-Conviction Petition at C000200.) Neither the 2002 Direct Appeal Order nor other court opinions in this case reference a used condom. According to the State, one of the detectives

1997 and placed him in a lineup.  (2002 Direct Appeal Order at 2.)  Rose B. viewed the lineup and "immediately" identified Petitioner as the person who had assaulted her.  (*Id.*)[5]  At some point, Petitioner's car was confiscated and taken to the police station.  (2002 Direct Appeal Order at 2.)[6] The front seats were removed and sent, along with the sexual assault kit, to the Illinois State Police Crime Lab.  (2002 Direct Appeal Order at 2.)  The lab detected semen on the pantyhose and oral swab, and blood on the front passenger seat of Petitioner's car.  (*Id.*)  Blood samples were taken from Petitioner and Rose B.

Semen stains from the oral swab were insufficient for testing, but the crime lab was able to test the semen stains on Rose B.'s pantyhose and concluded that the DNA profile from the stains on the pantyhose matched Petitioner's DNA profile.  (*Id.*)  Blood stains from the seat of Petitioner's car "matched Rose B.'s blood."  (*Id.*)  Finally, a forensic scientist "compared nine suitable latent prints taken from Rose B.'s car" and "determined all of the lifts were prints made by Antoine."  (*Id.*)

## B.    Procedural History

### 1.    Pre-Trial Motions

Through appointed counsel Donna Foley, Petitioner filed several pre-trial motions.  First,

---

involved in the search testified that "he never recovered a used condom."   (Opposition to Petitioner's Direct Appeal, Ex. C to SCR [28-3], at 54.)

[5]    Petitioner disputes that Rose B. immediately identified him as the perpetrator. (*See* Habeas Petition at 22.)  According to Petitioner, Rose B. "could not identify [him] on three different occasions."  (*Id.*)  Rather, Petitioner contends, she identified him only after the police put her in a room with another of Petitioner's alleged victims and showed them photographs of Petitioner.  (*See id.*; *Pro Se* Post-Conviction Petition, Ex. H to SCR [28-8], at C000206-08.)  The court has located no evidence in the record that supports Petitioner's version of the lineup.  But because, as discussed below, Petitioner's claims are procedurally defaulted, this dispute is immaterial (as are other purported factual disputes, for example, one involving the alleged use, at sentencing, of false evidence of a stalking incident, *see* Reply in Support of Petition for Writ of Habeas Corpus ("Habeas Reply") [34], at 5-8).

[6]    According to Petitioner, police recovered the car when they executed the search warrant. (Petitioner Brief on Direct Appeal, Ex. B. to SCR ("Direct Appeal Br.") [28-2], at 9.)

he moved to quash the search warrant and suppress evidence, arguing that "(1) the complaint failed to establish probable cause, and (2) the complainant, Detective Villanova, failed to tell the court that the latent fingerprint recovered from the victim's car was only a 'tentative identification' match to Antoine." (*See* Direct Appeal Br. at 8.)[7]  Second, Petitioner filed a motion asking the trial judge (Judge Nowinski) to recuse himself from the case or, alternatively, from ruling on the pre-trial motions, because he had issued the search warrant. (*See id.* at 8-9.)  Judge Nowinski transferred the matter to a different judge "for a determination of whether the search warrant complaint stated probable cause." (*Id.* at 9.)  The transferee judge determined that it did. (*Id.*)  Judge Nowinski, therefore, retained jurisdiction over the case and next set out to determine whether Detective Villanova's statement in the search warrant complaint—"that the latent impression recovered from [Rose B.'s] car was consistent with fingerprints belonging to [Petitioner]"—was false. (*Id.*)  After hearing arguments from both parties, Judge Nowinski ruled that Detective Villanova's statement "was not misleading or a falsehood," and that Petitioner was therefore not entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), concerning the veracity of the affidavit used to obtain the search warrant. (Direct Appeal Br. at 9.)  Petitioner also moved to suppress the lineup identification evidence, but the court denied that motion as well. (*Id.* at 9.)[8]

### 2.    Trial and Sentencing

Attorney Foley represented Petitioner at trial. (*See, e.g.*, Direct Appeal Br. at 11.)  On September 28, 2000, the jury found Petitioner guilty of two counts of aggravated criminal sexual assault. (2002 Direct Appeal Order at 1.)  Through counsel, Petitioner timely filed a motion for a

---

[7]     The Direct Appeal Brief does not state what evidence Petitioner moved to suppress, and the court has not been able to locate the motion.  The court assumes that Petitioner moved to suppress the fruits of the search of his home, which included his car.

[8]     An index attached to Petitioner's brief on direct appeal indicates that he filed at least 12 other pre-trial motions, some of them *pro se*. (Direct Appeal Br. at A-1-A-3.)

new trial, but at a hearing on that motion, scheduled for the same day as sentencing, Petitioner requested a continuance "to secure the presence of" a different attorney to represent him. (*See id.* at 9.) Petitioner told the court that "he wanted to fire Foley" because he was dissatisfied with her performance: he reported that she "refused to come see me in the jail. When she did come to see me, she didn't bring a new trial motion. . . . She hasn't did [sic] anything that I asked her to do at all." (*Id.*) Petitioner then informed the court that he was "filing a new trial motion" himself and "firing Ms. Foley off this case." (*Id.*) When the court asked Petitioner to elaborate on why he thought Attorney Foley's performance was inadequate, he answered that the *pro se* motion he intended to file would "state for itself . . . what [Attorney Foley] did. Ineffective assistance of counsel, due process violations." (*Id.*)

The trial judge observed that in his view, Ms. Foley had been "most competent, most efficient," and he had seen no basis to fault her performance. (*Id.*) The judge announced that he intended to move forward with sentencing and asked Petitioner if he was "ready to proceed" without Attorney Foley. (*Id.*) Petitioner responded that he did not want to represent himself and told the court, "I already talked to an attorney, and *I'm hiring* an attorney." (*Id.* (emphasis added).) After more dialogue, Petitioner asserted, "I *have already retained* an attorney"—Robert Willis. (*Id.* at 10 (emphasis added).) The court pointed out that Attorney Willis had not filed an appearance, was not the attorney of record, and was not present. (*Id.*) Over Petitioner's objections, the court denied the motion for a new trial; refused to consider Petitioner's *pro se* motion for a new trial, which purportedly included arguments concerning ineffective assistance of trial counsel; and proceeded with sentencing. (*Id.*) It is unclear whether Petitioner ever filed the *pro se* motion.[9]

---

[9]    Petitioner included a copy of such a motion which this court, but there is no indication, such as a file stamp, that the document was in fact filed in the trial court. (*See* Habeas Reply at 97-121.) Petitioner maintains that "the record shows" that the trial court "precluded him from filing the motion with the clerk." (Petitioner Reply in Support of Direct Appeal, Ex. D to SCR ("Direct Appeal Reply") [28-4], at 19.) The court has searched the record for evidence to support this claim but has found none.

At the sentencing hearing, the trial court heard testimony from two victims whom Petitioner confessed he raped in 1982. (*See, e.g.*, Direct Appeal Br. at 11; 2002 Direct Appeal Order at 1-3.) The trial court also heard evidence about other crimes that Petitioner had been accused of committing, including stalking a woman in Urbana, Illinois in 1996, and forcing his penis onto a 13-year-old girl's lips in 1997. (2002 Direct Appeal Order at 3.) Finally, the trial court heard evidence that in March or April of 1997, while Petitioner was in jail for the assault of Rose B., he allegedly sought to have Rose B. killed. (*Id.*) The State learned of the attempted hit from an informant who was housed in the jail cell adjacent to Petitioner's. (*Id.*) "Based on [Petitioner's] prior convictions and the nature of" the convictions for the sexual assaults of Rose B., the trial court sentenced Petitioner to two consecutive 60-year prison terms.. (*Id.* at 1.) Petitioner timely filed a motion to reconsider the sentence, which the court denied. (*See* Direct Appeal Br. at 13.)

### 3.    Direct Appeal

With the assistance of appointed counsel from the Office of the State Appellate Defender, Petitioner appealed. He advanced the following arguments: (1) Petitioner was "entitled to a new trial because the trial court did not transfer his recusal motion and motion for substitution of judge for cause to another judge for ruling"; (2) the trial court erred in refusing to hold a *Franks* hearing on the veracity of the search warrant affidavit; (3) "the trial court erred in denying [Petitioner's] motion for a continuance to secure the presence of his newly hired attorney"; (4) "the trial court did not properly consider his allegations of ineffective assistance of counsel prior to sentencing"; and (5) Section 5/5–5–3.2(b)(1) of the Unified Code of Corrections (730 ILCS 5/5–5–3.2(b)(1) (West 1996))—which allows "extended sentences based on prior convictions"—and Section 5/5–8–4 of the Unified Code of Corrections (730 ILCS 5/5–8–4 (West 1996))—which "mandate[s] consecutive sentencing in certain circumstances"—violate *Apprendi v. New Jersey*, 530 U.S. 466

(2000).[10] (2002 Direct Appeal Order at 1, 14; *see also* Direct Appeal Br. at 14-44.) On November 13, 2002, the Appellate Court of Illinois determined that each argument lacked merit and affirmed Petitioner's convictions and sentence. (*See* 2002 Direct Appeal Order at 1, 14.)

Because Petitioner raises ineffective assistance of trial counsel claims in his federal habeas application, his fourth ground for relief on direct appeal—that the trial court improperly failed to consider his ineffective assistance of counsel claims—deserves further mention. As noted above, Petitioner did not press ineffective assistance claims on direct appeal. Rather, he argued that he tried to present ineffective assistance claims to the trial court; the trial court ignored them; and remand was therefore necessary under *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045, 80 Ill. Dec. 62 (1984), for an inquiry into the ineffective assistance claims. (Direct Appeal Br. at 37.) According to Petitioner, *Krankel* requires, at a minimum, that "[w]hen a defendant raises a claim of his attorney's ineffectiveness," the trial judge must "fairly examine the factual matters which are the basis of the claim." (*Id.* at 35.)

In advancing his *Krankel* argument, Petitioner listed five ineffective assistance arguments that he claims to have made in his *pro se* motion for a new trial: trial counsel failed to (1) "interview and call to testify six separate witnesses who would have supported an alibi defense";[11] (2) "present exonerating evidence that the latent print recovered from [Rose B.'s] car was analyzed by the [AFIS] and had negative results";[12] (3) "properly attack the chain of custody of physical

---

[10]    In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

[11]    In the direct appeal brief filed by counsel, Petitioner did not identify the purported alibi witnesses or discuss the testimony they allegedly could have offered. (*See id.*) Petitioner did identify the witnesses in his *pro se* motion for a new trial, but stated only that they would have testified about his "whereabouts at the time the alleged crime occurred." (*See* Habeas Reply at 98 (attaching *pro se* motion for a new trial).)

[12]    As noted above, according to Petitioner's version of the events, the AFIS initially returned no match for the latent fingerprints collected from the crime scene. (*See* Habeas Petition at 23.) The court assumes this is the "negative" result referenced here.

evidence"; (4) "request independent DNA testing"; or (5) "properly inquire into whether a juror who had read a prejudicial newspaper article about the case had done so prior to deliberations."[13] (Direct Appeal Br. at 36.) .In Illinois, defendants are permitted to raise ineffective assistance of counsel claims on direct appeal; in fact, defendants are "required" to raise such claims on direct appeal if they are "apparent on the record," or else risk forfeiture. *People v. Veach*, 2017 IL 120649 ¶¶ 46-47; *see Crutchfield v. Dennison*, 910 F.3d 968, 976 (7th Cir. 2018) (citing same), *cert. denied*, 139 S. Ct. 1587, 203 L. Ed. 2d 716 (2019). Although Petitioner's brief on direct appeal, filed by counsel, listed the ineffective assistance arguments, it did not discuss their underlying facts or merits, nor did it suggest that the merits of any such claims were "apparent on the record." *Veach*, 2017 IL 120649 ¶ 46. (*See* Direct Appeal Br. at 33-37; Direct Appeal Reply at 18-20; *see also* Direct Appeal Reply at 18 (characterizing as "premature" the State's argument that Petitioner received *effective* assistance at trial because the appeal did not concern whether Petitioner was entitled to a new trial; rather, Petitioner's argument was that the trial court erred in failing to consider his ineffective assistance claims, and he was therefore entitled to remand for an inquiry into those claims).)

Addressing Petitioner's *Krankel* argument, the appellate court first identified the ineffective-assistance arguments that had been presented to the trial judge; those did not include arguments in Petitioner's *pro se* motion. The appellate court noted that the copy of that motion presented on appeal was "not signed, dated, notarized, or file stamped," nor was it "part of the

---

[13]     According to Petitioner, the article, titled "Prosecutors Link Accused Man to Assault," recounted the assault on Rose B. and "describe[d] in detail the petitioner's criminal history," including his 11-year prison sentence in 1982. (*See Pro-Se* Post Conviction Petition at C000215.) Petitioner contends that a juror told a clerk of court that she had read the article, "which swayed her verdict to guilty." (*Id.* at C000214.) At an October 5, 2000 hearing, Petitioner maintains, the court obtained testimony from the juror but asked only one question: whether she had read the article "before or after deliberation." (*Id.*) Petitioner states that the "juror contradicted the original version and replied that [she had] read this article after the verdict of guilty." (*Id.*) Petitioner contends that his trial counsel "was denied access to ask this juror other questions, or to request that all remaining (13) jurors be called . . . to court concerning these allegations of prejudice by this single juror." (*Id.* at C000215.)

common law record." (2002 Direct Appeal Order at 13.)  Rather, Petitioner's appellate counsel "inserted [it] in a supplemental volume," and "[n]othing in the record"—other than Petitioner's "assertions in his brief"—satisfied the reviewing court that "this motion was the motion [he] was referring to" at the hearing on his motion for a new trial and sentencing. (*Id.*)  For those reasons, the appellate court considered only those ineffective-assistance arguments that Petitioner made at the post-trial hearing:  that trial counsel did not visit Petitioner in jail; when she did, she "did not bring a copy of the posttrial motion"; she "did not raise any of the issues [Petitioner] wanted to raise posttrial"; she was generally ineffective; and she caused Petitioner to suffer unspecified due process violations. (*Id.*)  Based on its review of the record, the appellate court determined that trial counsel had "vigorously and ably" represented Petitioner and had not neglected his case. (*Id.*)  Referencing developments in Illinois law after *Krankel*, the court also determined that the trial court did not err in denying Petitioner "the opportunity to obtain other counsel to argue his" *pro se* ineffective assistance of counsel motion because Petitioner's "allegations were spurious, or related to trial tactics, or not supported by the record." (*Id.* (citing, inter alia, *People v. Ramey*, 152 Ill. 2d 41, 52, 604 N.E.2d 275, 280, 178 Ill. Dec. 19, 24 (1992) ("Only if the defendant's allegations indicate that trial counsel neglected the defendant's case, should the court appoint new counsel to represent the defendant" to help argue the ineffective assistance allegations)).)

After the appellate court upheld his conviction and sentence, Petitioner timely filed a petition for rehearing. The appellate court denied that petition on December 11, 2002. (*See* Petition for Leave to Appeal, Ex. E to SCR ("Direct Appeal PLA") [28-5], at 1.)  On January 13, 2003, with the assistance of appointed counsel, Petitioner filed a petition for leave to appeal in the Supreme Court of Illinois. (*Id.*) He advanced three claims: (1) the trial court denied Petitioner his Sixth Amendment right to counsel of choice by refusing "to grant . . . a short continuance" so that Petitioner's "newly-hired attorney" could represent him on his post-trial motions and at his sentencing hearing; (2) because the trial court "fail[ed] to conduct even the slightest inquiry into [Petitioner's] allegations of ineffective assistance of counsel," *Krankel* and its progeny require

remand for a hearing on the issue, which the appellate court had "erroneously denied"; and (3) the extended-term sentences based on Petitioner's prior convictions run afoul of *Apprendi*. (*Id.* at 7, 12-17.) Apart from his complaint that the appellate court had failed to address his ineffective assistance arguments, Petitioner again declined to discuss the merits of those claims in advancing his *Krankel* argument. (*See id.* at 12-16.) The Supreme Court of Illinois denied the PLA on April 2, 2003. (*See* April 2003 PLA Order, Ex. F to SCR [28-6].) Petitioner then sought a writ of certiorari, which the U.S. Supreme Court denied on October 6, 2003. (*See Antoine v. Illinois*, 540 U.S. 890 (2003), Ex. G to SCR [28-7].)

### 4. State Post-Conviction Review

The Illinois Post-Conviction Hearing Act "provides a convicted defendant with a means to raise a constitutional challenge to the proceedings underlying his conviction and sentence." (*People v. Antoine*, 2014 IL App (1st) 123399-U, Ex. O to SCR ("2014 Appellate Post-Conviction Order") [28-15] ¶ 11 (citing 725 ILCS 5/122–1(a) (West 2002)).) "A postconviction petition may be summarily dismissed if the trial court determines the petition is 'frivolous or is patently without merit.'" (*Id.*) "If the petition is not dismissed, [it] advances to the second stage of proceedings and counsel is appointed." (*Id.*). "The State then must either answer the pleading or move to dismiss." (*Id.*) "At the second stage of postconviction proceedings, the trial court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." (*Id.* ¶ 12.) If the well-pleaded facts in those submissions, taken as true, "do not demonstrate a constitutional violation, the petition is dismissed." (*Id.*)

When a trial court appoints counsel to represent an indigent defendant, "the defendant is entitled only to the level of assistance guaranteed by the [Illinois Post-Conviction Hearing Act]," which the Supreme Court of Illinois "has determined to be only a 'reasonable' level of assistance." (*Id.* ¶ 13 (quoting *People v. McNeal*, 194 Ill. 2d 135, 142, 742 N.E.2d 269, 273, 252 Ill. Dec. 19, 23 (2000).) Illinois Supreme Court Rule 651(c) directs appointed counsel to perform certain duties in representing a petitioner in post-conviction proceedings. The duties include "consult[ing] with

11

petitioner by phone, mail, electronic means or in person to ascertain his . . . contentions of deprivation of constitutional rights," "examin[ing] the record of the proceedings at the trial," and making "any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions."  IL S. CT R. 651(c).  "The filing of a 651(c) certificate creates a presumption of compliance with the rule."  (2014 Appellate Post-Conviction Order ¶ 13.)

On September 22, 2003, Petitioner filed a *pro se* post-conviction petition alleging the following grounds for relief: (1) trial counsel was ineffective for 27 reasons; (2) appellate counsel was ineffective for 17 reasons; (3) the trial court abused its discretion by allegedly allowing the prosecutor to improperly broaden the indictment before trial; (4) the search warrant was improperly issued and executed; (5) the lineup and photo array identification were suggestive; (6) an inflammatory newspaper article influenced a juror before deliberations; (7) the prosecutor improperly broadened the indictment before trial; (8) the prosecutor and the police failed to establish chain of custody for the fingerprint and DNA evidence used at trial; (9) Petitioner's right to a speedy trial was violated; (10) Petitioner's arrest was illegal; (11) the prosecutor failed to disclose exculpatory evidence (namely, medical reports concerning the post-assault physical examination of Rose B., forensic testing on "all clothing taken from" Rose B., and forensic testing on bed sheets, pillowcases, and cigarette butts taken from Petitioner's home during the search); (12) the prosecutor and the police intentionally destroyed exculpatory evidence (clothing Rose B. was wearing during the assault, which detectives allegedly recovered from her home); (13) insufficiency of the evidence; and (14) the trial court erred in denying Petitioner's motion for a directed verdict.  (*See Pro Se* Post-Conviction Petition.)[14]  Petitioner attached exhibits and cited

---

[14]        According to the trial court, Petitioner alleged two additional grounds for relief: (1) "the Circuit Court's factual findings were against the manifest weight of the evidence"; and (2) the "prosecutor misstated the evidence in closing argument."  (*People v. Antoine*, 97 CR 12134 (Cir. Ct. Cook Cnty. Nov. 9, 2012) (unpublished), Ex. K to SCR ("2012 Trial Court Post-Conviction Order") [28-11], at 1-2.)  These allegations do not appear in this court's copy of the *Pro Se* Post-Conviction Petition.

case law in support of each ground for relief.[15]  Notably, in contending that appellate counsel was ineffective, Petitioner argued that counsel failed to raise numerous issues on direct appeal and thereby rendered their merits unreviewable in collateral proceedings.  (*See Pro Se* Post-Conviction Petition at C000182 (arguing that appellate counsel's failure to raise issues caused "[p]rejudice of further review of these issues which was objectively unreasonable and the sentence or conviction would have been reversed had the issues been raised").)

In December 2003, Petitioner filed a supplement to his *Pro Se* Post-Conviction Petition, adding three more arguments:  that (1) the trial court abused its discretion by allowing the prosecutor to introduce improper aggravation testimony at sentencing; (2) the prosecutor misstated evidence in closing arguments; and (3) the prosecutor tampered with records.  (*See* Supplemental *Pro Se* Post-Conviction Petition, Ex. I to SCR [28-9, at C0001036-46].)  Along with his *pro se* post-conviction petitions, Petitioner filed a *pro se* motion for additional forensic testing. (*See* Brief in Support of Petitioner's Appeal of Trial Court Order Denying Post-Conviction Petition, Ex. L to SCR ("Petitioner Post-Conviction Appeal Br.") [28-12], at 6.)  As the court discusses later in this opinion, Petitioner's motion for forensic testing—and subsequent similar motions—were denied.

The court appointed counsel for Petitioner for purposes of his post-conviction initial review proceeding.  (*See id.* 6.)  Petitioner continued to file *pro se* motions thereafter, however, and the case was continued through 2008 while counsel "sorted through" them.  (*Id.*; *see also* Opposition

---

[15]     Petitioner lists the exhibits in a table of contents to each claim, but the exhibits themselves are not included in the record before this court.  According to the tables of contents, many of the exhibits are attorney correspondence, motions, court transcripts, police reports, and laboratory reports from the underlying proceedings.  (*See, e.g.*, Pro-Se Post Conviction Petition at C000176-77, 188-89, 197, 205, 213, 220, 252-54.)  The exhibits listed for the claims concerning destruction and withholding of evidence are motions, trial testimony, and the following police documents:  a sexual assault evidence kit worksheet, a list of items obtained from Rose B.'s home and placed into inventory for shipment to a forensic laboratory, and search warrant inventory sheets listing items obtained from Petitioner's home.  (*See id.* at C000281, 291.)  Based on the record before the court, it is unclear what happened to the clothing obtained from Rose B.'s home.

to Post-Conviction Appeal, Ex. M to Answer [28-13], at 18 (stating that Petitioner filed, among other things, five supplemental post-conviction petitions, and that it took months for "post-conviction counsel and the prosecutor" to index, copy, and verify that all parties had copies of all filings).)  In November 2008, the court granted Petitioner's motion to proceed *pro se* with standby counsel, which appears to have caused further delays.  (*See* Petitioner Post-Conviction Appeal Br. at 6.)  In April 2010, after the trial court had denied Petitioner's *pro se* motion for forensic testing, the court reappointed counsel (Frederick Weil) upon Petitioner's request.  (*See id.*; Habeas Petition at 11.)  In January 2011, Attorney Weil and Petitioner "agreed to withdraw all *pro se* filings except for the initial *pro se* post-conviction petition filed in September 2003, and the supplemental *pro se* post-conviction petition filed in December of 2003."  (Petitioner Post-Conviction Appeal Br. at 6.)  Attorney Weil then filed a Rule 651(c) certification and "st[ood] on" the initial and supplemental *pro se* petitions, meaning that he did not make any amendments.. (Post-Conviction Petition for Leave to Appeal, Ex. P to SCR ("Post-Conviction PLA") [28-16] at 9.)  After the State moved to dismiss the *pro se* petitions, Attorney Weil "indicated that he would not be filing a response."  (Petitioner Post-Conviction Appeal Br. at 6.)

On November 9, 2012, the trial court dismissed the *pro se* petitions for post-conviction relief.  (*See* 2012 Trial Court Post-Conviction Order at 6.)  The court stated, in relevant part:

> In the instant case, petitioner raised most of his claims on appeal, which the appellate [court] rejected, and are therefore barred by res judicata.  Moreover, his remaining claims are all a matter of trial record and as such, could have been raised on direct appeal.  Therefore, because petitioner failed to raise them on direct appeal, his remaining claims are barred by the doctrine of waiver.

(*Id.* at 4.)  The court did not specify which claims were barred by res judicata and which were waived.  (*See id.*)

Next, the court examined Petitioner's ineffective assistance claims under *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* provides that, to prevail on a claim for ineffective assistance of counsel, a petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for

14

counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 694. The court stated: "In this case, the appellate court has already determined that trial counsel vigorously and ably represented the defendant. Additionally, with respect to appellate counsel, defendant has failed to provide any support for his allegations nor met the *Strickland* standard. Therefore, his claim that appellate counsel was ineffective also fails." (2012 Trial Court Post-Conviction Order at 5.)

Through different appointed counsel, Petitioner appealed. He argued that Attorney Weil violated Illinois Supreme Court Rule 651(c) by failing to preserve the claims that the trial court dismissed as forfeited. (Petitioner Post-Conviction Appeal Br. at 8-14.) According to Petitioner, Rule 651(c) required Attorney Weil to preserve those claims, regardless of their merit, by adding to the *pro se* post-conviction petitions "a claim of appellate counsel's ineffectiveness to *any* claim subject to forfeiture because it was not raised on direct appeal." (*Id.* at 8 (emphasis added) (citing *People v. Turner*, 187 Ill. 2d 406, 412-14, 719 N.E.2d 725, 729-30, 241 Ill. Dec. 596, 600-01 (1999) (stating that "Rule 651(c) plainly requires that appointed post-conviction counsel make any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions," and determining that post-conviction counsel's performance "fell below the level of assistance required by Rule 651(c)" because he failed, among other things, to "amend[] the post-conviction petition to allege ineffective assistance of appellate counsel for failing to raise petitioner's claims on direct appeal" (internal quotation marks omitted)); *see also Turner*, 187 Ill. 2d at 416, 719 N.E.2d at 731, 241 Ill. Dec. at 602 ("This court will not speculate whether the trial court would have dismissed the petition without an evidentiary hearing if counsel had adequately performed his duties under Rule 651(c).")). Petitioner contended that Attorney Weil could have "safely evade[d] procedural default" by simply alleging that counsel on direct appeal was ineffective in failing to raise all of Petitioner's ineffective-assistance clams. (*See* Petitioner Reply in Support of Post-Conviction Appeal, Ex. N to SCR ("Post-Conviction Appeal Reply") [28-14], at 7.) Petitioner listed examples of claims that post-conviction counsel should

have preserved in this manner. (*See* Petitioner Post-Conviction Appeal Br. at 10-11.)

Because Attorney Weil failed to amend the *pro se* post-conviction petitions to avoid forfeiture of claims not raised on direct appeal, Petitioner asked the appellate court to reverse the dismissal of his post-conviction petitions and remand for "additional second-stage proceedings and amendment of the petition." (Petitioner Post-Conviction Appeal Br. at 13-14.) Petitioner did not discuss the merits of the claims that the trial court determined were forfeited. (*See generally id.*) Instead, he made a pure "form over substance" argument: that a court's "Rule 651(c) analysis [is] driven, not by whether a particular defendant's claim is potentially meritorious, but by the conviction that where postconviction counsel does not adequately complete the duties mandated by the rule, the limited right to counsel conferred by the [Illinois Post-Conviction Hearing Act] cannot be fully realized." (Post-Conviction Appeal Reply at 3-4 (quoting *People v. Suarez*, 224 Ill. 2d 37, 51, 862 N.E.2d 977, 985, 308 Ill. Dec. 774, 782 (2007)).)

The appellate court affirmed the dismissal of the *pro se* post-conviction petitions. (*See* 2014 Appellate Post-Conviction Order ¶ 1.) First, it stated that "appointed postconviction counsel need only amend the *pro se* petition to sufficiently present" the claims the petitioner advanced therein, and "need only amend those claims that are meritorious." (*Id.* ¶ 16 (citing *People v. Greer*, 212 Ill. 2d 192, 205, 817 N.E.2d 511, 519, 288 Ill. Dec. 153, 161 (2004) ("If amendments to a *pro se* postconviction petition would only further a frivolous or patently nonmeritorious claim, they are not 'necessary' within the meaning of" Rule 651(c))).) It continued by observing that Petitioner's *pro se* post-conviction petitions "presented 17 bases of ineffective assistance of appellate counsel" and revealed that Petitioner "had knowledge of the doctrine of forfeiture," as demonstrated by his claim that appellate counsel's failure to raise certain issues on direct appeal "caused [him] Prejudice for further review of these issues . . . ." (2014 Appellate Post-Conviction Order ¶ 16 (quoting *Pro Se* Post-Conviction Petition at C000182).) The court noted that postconviction counsel "spent *years* reviewing" the *pro se* post-conviction petitions and then "chose not to amend" it. (*Id.* ¶ 17.) According to the court, there was "nothing in the record to

16

support defendant's contention that postconviction counsel's choice violated Rule 651(c), especially where defendant has not presented any arguments demonstrating that his claims were meritorious." (*Id.*) The court "recognize[d] that . . . harmless error analysis is not appropriate where there has been a violation of Rule 651(c)" (*id.* (citing *Suarez*, 224 Ill. 2d at 47, 862 N.E.2d at 982, 308 Ill. Dec. at 779)), but determined that "harmless error analysis has no application because the record does not support a finding that postconviction counsel failed to satisfy Rule 651(c)." (2014 Appellate Post-Conviction Order ¶ 17.) The court separately noted that the specific claims Petitioner identified as forfeited in fact "appear to have been barred by *res judicata.*" (*Id.* ¶ 21.)

With assistance of appointed counsel, Petitioner filed a petition for rehearing, which the appellate court denied on May 4, 2015. (*See* Post-Conviction PLA at PageID #1103.) Through counsel, Petitioner next filed a petition for leave to appeal in the Supreme Court of Illinois, arguing that the "Court's review is warranted to clarify that Rule 651(c) compliance is required irrespective of the appellate court's belief that the *pro se* claims are without merit." (*Id.* at 3.) Petitioner asked the Court to "issue a supervisory order that directs the appellate court to follow [its] precedent, which states that Rule 651(c) violations are not reviewed for harmless error." (*Id.* at 10.) In the alternative, he asked the Court to "grant leave to appeal to clarify whether counsel must amend a claim to avoid forfeiture under Rule 651(c), even in cases where the court finds the underlying claim lacks merit." (*Id.*) Petitioner also argued that the Court could not avoid deciding the Rule 651(c) issue on the alternative ground identified by the appellate court—that Petitioner's claims were barred by res judicata, not forfeiture—because in Petitioner's view, the appellate court's ruling in that regard "does not survive scrutiny." (*Id.* at 4.) The Supreme Court of Illinois denied the petition for leave to appeal on September 30, 2015. (*See* Order, Ex. Q to SCR [28-17], at 1.)

### 5. Motions for Forensic Testing

As noted above, along with his *pro se* post-conviction petitions, Petitioner filed a *pro se* motion for forensic testing under 725 ILCS 5/116–3. The version of that statute in effect in

September 2003—when Petitioner filed his motion—permitted a convicted defendant to move for fingerprint or forensic DNA testing "on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of trial." (*People v. Antoine*, 2013 IL App (1st) 093141-U, Ex. J to SCR ("2013 Forensic Testing Appellate Order") [28-10], ¶ 8 (quoting 725 ILCS 5/116–3(a) (West 2002)).) To prevail on his motion, Petitioner had to make prima facie showings that (1) identity was at issue at his trial and (2) "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." (2013 Forensic Testing Appellate Order ¶ 8 (quoting 725 ILCS 5/116–3(b) (West 2002)).) The trial court, in turn, was required to "allow the testing . . . upon a determination that (1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant," and (2) "the testing requested employs a scientific method generally accepted within the relevant scientific community." (2013 Forensic Testing Appellate Order ¶ 8 (quoting 725 ILCS 5/116–3 (c) (West 2002)).)[16]

---

[16] According to the court, "[t]he record fails to reveal whether any action was taken on" Petitioner's September 2003 motion. (2013 Forensic Testing Appellate Order ¶ 5.) Petitioner filed an "amended and revised" Section 116–3 motion in December 2008, and that is the motion the state courts adjudicated. (*Id.*) Section 116–3 had been amended in the interim, in October 2007. *See* 2007 Ill. Legis. Serv. P.A. 95-688 (S.B. 1023) (West). The amendment divided the evidence on which a defendant can obtain testing into two categories: evidence that (1) "was not subject to the testing which is now requested at the time of trial;" or (2) "although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." *Id.* It also provided that "[i]f evidence previously tested pursuant to this Section reveals an unknown fingerprint from the crime scene that does not match the defendant or the victim," the unknown fingerprint evidence must be submitted into the Federal Bureau of Investigation's AFIS for identification. *Id.* It is unclear why the state courts did not apply the amended version of the statute in Petitioner's case. But as discussed below, the appellate court's reasons for denying Petitioner's motion do not depend on amended portions of the statute. Moreover, Petitioner does not argue that the court should have applied the amended version.

Petitioner moved for forensic testing of (1) the semen stains found on Rose B.'s pantyhose (which were tested at the time of trial); (2) the oral swab containing semen stains (which was not tested at the time of trial "because of insufficient material" (2002 Direct Appeal Order at 2)); and (3) Petitioner's pubic hair recovered from the sexual assault kit (which was not tested at the time of trial for reasons unknown to this court). (2013 Forensic Testing Appellate Order ¶ 9.) The trial court denied the motion and the appellate court affirmed. (*See id.* ¶ 1.) First, it determined that Petitioner failed to present a "prima facie case establishing a sufficient chain of custody for" the oral swab and pubic hair. (*Id.* ¶ 12.) It explained that a "conclusory assertion regarding the chain of evidence would have been sufficient had [Petitioner] merely requested additional testing on evidence that had been admitted at trial." (*Id.*) But Petitioner requested testing on items that were not admitted at trial and made "inconsistent statements regarding the chain of custody" for those materials in his briefing. (*Id.*) Together, those factors "prevented him from establishing a *prima facie* case" on the issue. (*Id.*). Next, the court determined that Petitioner "failed to establish that retesting of [the semen stains on Rose B's pantyhose] would produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence." (*Id.* ¶¶ 1, 16 (internal quotation marks omitted).) The Supreme Court of Illinois denied Petitioner's petition for leave to appeal. *See People v. Antoine*, 2 N.E.3d 1047 (Table), 377 Ill. Dec. 766 (Nov. 27, 2013).

Petitioner filed a second § 5/116–3 motion for forensic testing on March 11, 2014. *See People v. Antoine*, 2017 IL App (1st) 141758-U ("2017 Forensic Testing Appellate Order"). In this second motion, he requested that (1) "all unidentified fingerprints be run through both the FBI's and the Illinois State Police's fingerprint databases;" and (2) "DNA testing be performed on all evidence recovered from the victim's sexual assault kit and on the blood evidence obtained from [Petitioner's] vehicle." *Id.* ¶ 7. Petitioner argued that newer, more accurate testing methods were available, and that they were reasonably likely to produce evidence relevant to his claim of actual innocence. *Id.* ¶¶ 7, 11. The trial court denied the motion; Petitioner abandoned his fingerprint-related request on appeal, and the appellate court affirmed on his remaining claims. *See id.* ¶¶

19

1, 9, 14 n.2. The appellate court noted, among other things, that Petitioner failed to demonstrate inaccuracies in the original DNA test of the semen stains on Rose B.'s pantyhose, which showed strong matches. *See id.* ¶¶ 16-17. In particular, one of the matches "would be expected to occur in approximately 1 in 556 million Blacks, 1 in 203 million Caucasians, or 1 in 105 million Hispanics." *Id.* ¶ 16. The other would be expected to occur in "approximately 1 in 200 million Blacks, 1 in 160 million Caucasians, and 1 in 100 million Hispanics." *Id.* The appellate court also determined that even "a favorable result from the testing or retesting of any of the pieces of evidence would not significantly advance [Petitioner's] actual innocence claim where the remaining pieces of evidence overwhelmingly support the jury's verdict." *Id.* ¶ 19 (internal quotation marks omitted). Therefore, the court concluded, the trial court did not err in denying Petitioner's 5/116–3 motion. *Id.*[17] The Supreme Court of Illinois denied Petitioner's petition for leave to appeal. *See People v. Antoine*, 94 N.E.3d 660 (Table), 419 Ill. Dec. 791 (Jan. 18, 2018).

On February 18, 2016, Petitioner filed a motion for a DNA database search under 725 ILCS 5/116–5. (*See People v. Antoine*, Summary Order, No. 97 CR 12134 (5th Dist. Aug. 31, 2018) (unpublished), Attachment to March 2020 Motion to Supplement ("2018 Forensic Testing Appellate Order") [46], at PageID #1444 ¶ 5).) Section 5/116–5 provides that "where DNA evidence may be material to the defense investigation or relevant at trial," and when certain conditions are met, "a court may order a DNA database search by the Department of State Police." 725 ILCS 5/116–5(a) (West 2018). Petitioner asked that the semen stains on Rose B.'s pantyhose "be retested using more advanced DNA testing to query DNA databases for possible matches to other DNA held therein." (2018 Forensic Testing Appellate Order ¶ 5.) In support, he attached correspondence with Karl A. Reich, Ph.D. (*See id.*) Reich wrote that the DNA testing

---

[17] The appellate court again applied the 2002 version of Section 116–3, despite that the statute had been amended in 2007 and again in August 2014. The 2014 amendment has no relevance to Petitioner's requests. Among other things, it extended the availability of testing to evidence that was secured in relation to a guilty plea. *See* 2014 Ill. Legis. Serv. P.A. 98-948 (S.B. 2995) (West).

performed at the time of Petitioner's trial does not meet "current standards for acceptability, accuracy, and/or reproducibility and that any profiles created using those methods cannot be used to search DNA databases." (*Id.* (internal quotation marks omitted).)  The trial court denied the motion. (*Id.* ¶ 6.)

Petitioner appealed, and the State Appellate Defender was appointed to represent him. (*Id.* ¶ 7.)  The State Appellate Defender moved to withdraw, arguing that the appeal presented "no issue of arguable merit" because, by its plain language, 725 ILCS 5/116–5 "provides for trial-level motions, not post-conviction requests for DNA testing." (State Appellate Defender Motion, Attached to March 2020 Motion to Supplement [46], at PageID #1416.)  The appellate court did not expressly adopt this reasoning, but it granted the motion to withdraw and affirmed the trial court's judgment on the section 5/116–5 motion because it "found no issues of arguable merit to be raised on appeal." (2018 Forensic Testing Appellate Order ¶ 9.)  The Supreme Court of Illinois denied Petitioner's petition for leave to appeal. *See People v. Antoine*, 119 N.E.3d 1054 (Table), 427 Ill. Dec. 772 (Mar. 20, 2019).

### 6. Proceedings in Federal Court

After exhausting his state appeals, on September 29, 2016, Petitioner filed his application for a writ of habeas corpus from this court.[18]  Before the Petition was fully briefed, Petitioner twice moved for attorney representation.  The court denied the motions without prejudice, explaining that "[c]ounsel is traditionally provided in a habeas corpus proceeding only if an evidentiary

---

[18]    The envelope in which Petitioner mailed his Petition to the court was postmarked on October 4, 2016, but Petitioner's affidavit and certificate of service state that he placed it in the prison's legal mailing system, with postage prepaid, on September 29, 2016. (*See* First Habeas Petition [1-1], at 118.)  The court placed Petitioner's original petition under seal because it did not comply with the redaction requirements of Federal Rule of Civil Procedure 5.2. (*See* Order [3].)  Petitioner then filed another copy of the original Petition [5], which the court also placed under seal.  After the court granted Petitioner's request for a two-week extension "to complete and copy the Federal Habeas Corpus petition," Petitioner filed another Petition on December 12, 2016, which is the operative version. (*See* Habeas Petition [13].)

hearing is needed or if the interests of justice require." (Order [15].)  The court explained that it would first "consider Respondent's response to the habeas corpus petition before determining whether counsel is necessary."  (*Id.*; *see also* Order [18] (same).)  Having now reviewed the Response, the court finds that no evidentiary hearing is necessary, and the interests of justice do not require the court to appoint counsel for Petitioner.

After the Petition was fully briefed, Petitioner submitted a letter reporting that state court proceedings on his motions for forensic testing were complete.  (May 2019 Letter [35].)  He asked the court for "at least" six months to incorporate the "supplemental pleadings" from those motions into his Petition.  (*Id.*)  The court gave Petitioner 30 days to do so, and then granted two motions for an extension of time.  (*See* Orders [38, 40, 42].)  Rather than supplement the record, however, Petitioner filed a motion for "Federal Civil Discovery" concerning fingerprint and DNA evidence.  (Discovery Motion [43].)  The court denied the motion, explaining that "a habeas proceeding is not a method for reopening the factual record."  (Order [44].)  The court concluded that all of Petitioner's state court remedies have been exhausted and that "[n]o further briefing on this petition is required."  (*Id.*)  Petitioner has nevertheless moved for leave to file a supplement pleading.  (*See* March 2020 Motion to Supplement.)  The court denies that motion as well; a habeas proceeding is not a method for reopening the factual record, not is it a vehicle for determining whether state courts correctly applied state law.  (*See* September 21, 2020 Order.)

The court now turns to Petitioner's § 2254 claims.  Petitioner asserts the following grounds for relief:  (1) trial counsel provided ineffective assistance for 12 reasons;[19] (2) appellate counsel

_____

[19]     Petitioner asserts that trial counsel failed to: (1) object to and file a motion to dismiss the indictment, which Petitioner contends was improperly broadened; (2) challenge the sufficiency of the State's identification, fingerprint, and other forensic evidence through independent laboratory testing; (3) obtain discovery of forensic evidence from clothing that Rose B. was wearing during the attack; (4) ask the juror who allegedly read a prejudicial newspaper article whether she did so before or after deliberations; (5) ask the remaining jurors whether the other juror tainted the verdict; (6) investigate and question the trial judge and courtroom clerk under oath about the incident with the juror and the newspaper article; (7) "directly examine the trial judge . . . and Detective Villanova" about their in-chambers meeting that resulted in the issuance of the search warrant for Petitioner's home; (8) retain an independent fingerprint expert

22

provided ineffective assistance by failing to raise certain claims;[20] (3) the trial court improperly allowed the State to proceed with an invalid indictment; (4) in searching Petitioner's residence, the police seized evidence that was not identified in the search warrant and affidavit; (5) the photograph array and lineup procedures were tainted and suggestive; (6) an inflammatory newspaper article prejudiced a juror and the jury's verdict; (7) the prosecutor improperly broadened the indictment without returning it to the Grand Jury; (8) Petitioner's arrest was illegal; (9) the police and the prosecutor failed to disclose exculpatory evidence; (10) the police and the prosecutor intentionally destroyed exculpatory evidence; (11) the trial court abused its discretion by permitting the prosecutor to introduce improper aggravation testimony at sentencing; and (12) the prosecutor misstated evidence in opening and closing arguments. (*See* Habeas Petition at 8-66.) As detailed below, the court concludes that each of these claims is procedurally defaulted and the default is not excused. Therefore, the Petition is denied.

## DISCUSSION

Section 2254 of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") empowers federal courts to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" only when that person's custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under AEDPA, a

---

to examine the fingerprint evidence; (9) test "untested" items from the sexual assault kit and "untested" blood stains; (10) hire a forensic expert to re-test the pantyhose that the State tested using RFLP (Restriction Fragment Length Polymorphism) DNA testing; (11) object to comments the prosecutor allegedly made in order to "inflame the jury's passion," including comments about acts that the State had declined to prosecute; and (12) honestly answer Petitioner's questions about whether her family members worked at the police department that investigated Petitioner and transported forensic evidence for the case. (Habeas Petition at 12-17.)

[20]     Petitioner asserts that appellate counsel failed to argue that (1) the trial court erred in denying his motion to suppress the allegedly suggestive lineup procedure, and (2) Petitioner was not proven guilty beyond a reasonable doubt because (a) the fingerprint evidence was unreliable, (b) the lineup procedure was tainted and suggestive, (c) the DNA from the semen stains on Rose B.'s pantyhose was tested using unreliable methods, and (d) the bloodstain collected from Petitioner's vehicle seat was tested using an unreliable method. (*Id.* at 19-24.)

federal court will grant a petition for habeas corpus under narrow circumstances: where the state court's decision on the federal constitutional question (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court [of the United States]"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Snow v. Pfister*, 880 F.3d 857, 863-64 (7th Cir. 2018) (quoting 28 U.S.C. § 2254(d)(1), (2)), *cert. denied sub nom. Snow v. Nicholson*, 138 S. Ct. 2637, 201 L. Ed. 2d 1030 (2018). "This standard is 'difficult to meet' and 'highly deferential.'" *Snow*, 880 F.3d at 864 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted). And it "applies only to claims that were actually 'adjudicated on the merits in state court proceedings.'" *Snow*, 880 F.3d at 864 (quoting *Campbell v. Reardon*, 780 F.3d 752, 762 (7th Cir. 2015); 28 U.S.C. § 2254(d)). For each claim, the court "review[s] the decision of the last state court to address its merits." *Snow*, 880 F.3d at 864.

"A habeas petitioner may not raise a federal claim that he has not exhausted in state court." *Schmidt v. Foster*, 911 F.3d 469, 486 (7th Cir. 2018) (citing 28 U.S.C. § 2254(b)(1)(A)), *cert. denied*, 140 S. Ct. 96, 205 L. Ed. 2d 52 (2019). Before seeking relief in federal court, therefore, the petitioner must give the state courts a full and fair opportunity to review and resolve his federal claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *see, e.g.*, *Snow*, 880 F.3d at 864. This means that a petitioner "must assert his federal claim through one complete round of state court review, either on direct review or in post-conviction proceedings." *McGhee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018) (internal quotation marks omitted); *see also, e.g.*, *Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017). Asserting claims through a complete round of state court review requires raising them "at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (citing *O'Sullivan*, 526 U.S. at 845). Thus, in Illinois, a petitioner must present his claims "in a petition for leave to appeal to the Illinois Supreme Court." *Snow*, 880 F.3d at 864 (citing *O'Sullivan*, 526 U.S. at 845-46). Fair presentation, moreover, typically entails "rais[ing]

24

both the operative facts and controlling legal principles in the state courts." *Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018), *cert. denied*, 140 S. Ct. 160, 205 L. Ed. 2d 51 (2019), *reh'g denied*, 140 S. Ct. 929, 205 L. Ed. 2d 507 (2020). If a petitioner fails to fairly and fully present his claims to the state courts as just described, the claims are procedurally defaulted and will not be addressed on their merits in federal court. *O'Sullivan*, 526 U.S. at 845; *see, e.g.*, *Snow*, 880 F.3d at 864.[21]

"Procedural default may be excused . . . where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Thomas*, 822 F.3d at 386 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)); *see Snow*, 880 F.3d at 864. "Cause" for default ordinarily is "some type of external impediment" that kept the petitioner from presenting his claim. *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012) (internal quotation marks and citations omitted). The "prejudice" requirement calls for a "showing that the violation of the petitioner's federal rights worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (internal quotation marks and citations omitted); *see also, e.g.*, *Lewis*, 390 F.3d at 1026.

Respondent argues that all 12 of Petitioner's federal habeas claims are procedurally defaulted. Petitioner both concedes and contests this point. For example, in advancing his claim for ineffective assistance of appellate counsel, he notes that appellate counsel raised only five issues on direct appeal—none of which are advanced here—and argues that appellate counsel failed to raise and exhaust "other stronger and obvious constitutional non-frivolous issues." (Habeas Petition at 21.) And in his Reply, Petitioner argues that appellate counsel "completely

---

[21]     Procedural default also occurs "[i]n cases where the state court declines to address a petitioner's federal claims because the petitioner did not meet state procedural requirements." *Snow*, 880 F.3d at 864. "In those cases, the state court judgment rests on an independent and adequate state ground, and principles of comity and federalism dictate against upending the state-court conviction, and instead, finding that the petitioner's claim is procedurally defaulted." *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016); *see Snow*, 880 F.3d at 864.

abandoned [his] meritorious issues on post-conviction appeal" and instead advanced only one state-law claim: that post-conviction counsel violated Illinois Supreme Court Rule 651(c). (Habeas Reply at 23.) Elsewhere, however, Petitioner appears to argue that certain claims are not procedurally defaulted. (*See, e.g.*, *id.* at 24-25 (urging the court to find that he fairly and fully presented federal issues to the state courts via his *pro se* post-conviction petitions).) In any event, Petitioner argues that even if his claims are procedurally defaulted, the defaults should be excused. These arguments are addressed below.

**A. Procedural Default**

**1. Direct Appeal**

Petitioner concedes that his appellate counsel presented only five claims on direct appeal: (1) that the trial judge mishandled the recusal motion and the motion to substitute; (2) the *Franks* claim; (3) that the trial court deprived Petitioner of his choice of counsel in violation of the Sixth Amendment of the U.S. Constitution; (4) the *Krankel* claim; and (5) the *Apprendi* claim. (*See, e.g.*, Habeas Petition at 20-11; 2002 Direct Appeal Order at 1.) The only federal claims in this group that Petitioner also advanced in his PLA to the Supreme Court of Illinois are the choice-of-counsel and *Apprendi* claims—but Petitioner does not press them here. Rather, he brings numerous claims for ineffective assistance of trial counsel and appears to maintain that he fairly presented them at every level of state court review. Petitioner's arguments are unpersuasive.

The court recognizes that Petitioner brought ineffective assistance of counsel claims to the trial court, both during the hearing on his post-trial motion and in the *pro se* post-trial motion that he may or may not have filed. In asserting his *Krankel* claim on direct appeal, Petitioner listed five of the ineffective assistance claims from his *pro se* post-trial motion that the trial court allegedly failed to review. (*See* Direct Appeal Br. at 36.) Construing Petitioner's federal habeas application liberally, he raises three of those five claims here: (1) trial counsel failed to "present exonerating evidence" that, before experts determined tentatively and then definitively that latent prints recovered from Rose B.'s car matched Petitioner's fingerprints (*see* 2002 Direct Appeal

Order at 2), the AFIS service returned "negative results" for the latent prints (Direct Appeal Br. at 36; *compare* Habeas Petition at 12, 14 (citing failure to challenge the sufficiency of the State's fingerprint evidence through independent testing)); (2) trial counsel failed to "request independent DNA testing" (Direct Appeal Br. at 36; *compare* Habeas Petition at 15 (citing failure to hire an expert to forensically test the evidence that the State tested using "the RFLP DNA testing procedure")); (3) trial counsel failed to "properly inquire into whether a juror who had read a prejudicial newspaper article about the case had done so prior to deliberations." (Direct Appeal Br. at 36; *compare* Habeas Petition at 13-14 (same)).

But several hurdles stand in Petitioner's way of showing full and fair presentment. First, as the appellate court noted, there is no evidence that Petitioner ever filed the *pro se* post-trial motion containing his ineffective assistance claims. (*See* 2002 Direct Appeal Order at 13 (stating that the motion provided in the record on appeal was "not signed, dated, notarized, or file stamped," nor was it "part of the common law record"). Second, even assuming the motion was properly filed, Petitioner did not present the factual basis for any ineffective assistance claims on direct appeal, nor did he argue their merits. (*See* Direct Appeal Br. at 33-37; Direct Appeal Reply at 18-20 (calling the State's merits arguments "premature").) Instead, as the appellate court noted, Petitioner contended that *Krankel* required remand to the trial court for an inquiry into the ineffective assistance claims "without any consideration on the merits of" those claims. (2002 Direct Appeal Order at 13.) Because Petitioner did not "rais[e] both the operative facts and controlling legal principles" of his ineffective assistance claims on direct appeal, he did not fairly present them to the appellate court. *Reynolds*, 902 F.3d at 705.

Petitioner urges that he argued the merits of his ineffective assistance claims in his *pro se* post-trial motion, including by applying pertinent federal case law to specific facts. (*See* Habeas Reply at 10.) He also contends that the appellate court considered and rejected that analysis. (*See id.* at 11.) As already noted, however, Petitioner did not present those arguments in his briefing on direct appeal. And although the appellate court stated that it reviewed Petitioner's

"allegations of ineffective assistance of counsel" and found them to be "spurious, or related to trial tactics, or not supported by the record" (2002 Direct Appeal Order at 13), it is not clear that the court was referring to the allegations in the *pro se* post-trial motion. To the contrary, elsewhere in the order, the court stated that it was "limit[ing] [its] review" of the ineffective assistance claims "to the oral arguments [Petitioner] made to the [trial] court." (*Id.*)[22] Petitioner does not advance any of those claims here. In any event, Petitioner also did not fairly present any ineffective assistance claim in his PLA, where he advanced his *Krankel* claim without so much as mentioning any specific ineffective assistance claim. (*See* Direct Appeal PLA at 12-16.) Thus, Petitioner failed to present any ineffective assistance claim through "each and every level" of direct appeal, including "in a petition for leave to appeal to the Illinois Supreme Court." *Snow*, 880 F.3d at 864; *Sternes*, 390 F.3d at 1025.

### 2. State Post-Conviction Proceedings

The Supreme Court of Illinois has stated that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings" than to direct appeal, "but only when the record is incomplete or inadequate for resolving the claim." *Veach*, 2017 IL 120649 ¶ 46; *see Crutchfield*, 910 F.3d at 976 (same). Petitioner failed to present any federal habeas claim at every level of the post-conviction proceedings, however. Between his original and supplemental *pro se* post-conviction petitions to the state trial court—which appointed post-conviction counsel Weil submitted unaltered and as a single motion—Petitioner asserted nearly twenty claims for relief. His claims concerning ineffective assistance of trial and appellate counsel themselves contained 27 and 17 subparts, respectively. Petitioner has raised many of these same claims for this court's

---

[22]     As recounted above, those claims were that trial counsel failed to visit Petitioner in jail, did not present the post-trial arguments that Petitioner wanted to make, caused Petitioner to suffer unspecified Due Process violations, and was generally ineffective. (*See* 2002 Direct Appeal Order at 13.)

review.[23] After the state trial court denied Petitioner's motion for post-conviction relief, however—including on the ground that Petitioner had forfeited numerous claims—Petitioner, through counsel, presented just one issue on appeal: that appointed post-conviction counsel (Attorney Weil) performed inadequately under state law by failing to properly amend the *pro se* post-conviction petitions so as to avoid potential forfeiture. (*See* Petitioner Post-Conviction Appeal Br. at 8.) As Respondent points out, Petitioner has not asserted a claim in this court for ineffective assistance of post-conviction counsel—and if he had, the claim would be non-cognizable. (Response at 12 (citing 28 U.S.C. § 2254(i) ("The ineffectiveness . . . of counsel during . . . State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.")).) Additionally, consistent with Petitioner's apparent view that Rule 651(c) requires post-conviction counsel to preserve any claim he might pursue, regardless of its merits, Petitioner did not present the appellate court with the underlying facts or controlling legal principles governing any of the claims he now asserts for federal habeas review. (*See generally* Petitioner Post-Conviction Appeal Br.; Post-Conviction Appeal Reply at 3-4 (arguing that "Rule 651(c) analysis" does not depend on whether the defendant's underlying claims are "potentially meritorious"); 2014 Appellate Post-Conviction Order ¶ 17 (stating that "nothing in the record . . . support[s] defendant's contention that postconviction counsel's choice violated Rule 651(c), *especially where defendant has not presented any arguments demonstrating that his claims were meritorious*" (emphasis added)).)

Petitioner did not fairly present any of his federal habeas claims in his PLA, either. There,

---

[23] The following is a non-exclusive list: trial counsel provided ineffective assistance because she did not move to dismiss the improperly broadened indictment, failed to properly investigate potential juror prejudice caused by the inflammatory newspaper article, and did not pursue discovery into certain forensic evidence; appellate counsel provided ineffective assistance by failing to raise and thereby defaulting several issues, including that trial court erred in denying the motion to suppress the lineup identification and Petitioner was not proven guilty beyond a reasonable doubt; Petitioner's arrest was illegal; and the prosecutor failed to disclose exculpatory evidence in violation of *Brady*. (*See Pro Se* Post-Conviction Petition at C000167-69, 181-82, 266, 273; Habeas Petition at 12-15, 21-24, 46, 49.)

he asked the Supreme Court of Illinois only to address the contours of Rule 651(c). (*See generally* Post-Conviction PLA.) He did not discuss the facts or law pertinent to his underlying claims and pressed his contention that as a matter of law, "counsel must amend a claim to avoid forfeiture under Rule 651(c), *even in cases where the court finds the underlying claim lacks merit.*" (*Id.* at 10 (emphasis added).) Petitioner, therefore, did not fairly present any of his federal habeas claims at every stage of the post-conviction proceedings.

Urging the court to conclude otherwise, Petitioner appears to argue that he gave the state courts a full and fair opportunity to review his federal claims during post-conviction proceedings because his *pro se* post-conviction petitions presented the operative facts and law governing those claims. (*See* Habeas Reply at 22-23.) Rather than address the claims on their merits, Petitioner contends, the state trial court "chose to adjudicate all . . . claims as being res judicata or being waived under state law framework." (*Id.* at 22.) Petitioner also argues that the state trial court "evaded a fair analysis" of his ineffective assistance claims "by rel[ying] on a prior determination of the appellate court on direct appeal." (*Id.* at 23.) But any flaws in the state trial court's reasoning are of no avail here because, as Petitioner concedes, he did not present his federal claims to the appellate court or in his PLA. (*See id.*)

Petitioner's reliance on *Long v. Butler*, 809 F.3d 299 (7th Cir. 2015), *reh'g en banc granted, judgment vacated on other grounds*, No. 13-3327, 2016 WL 1621711 (7th Cir. Apr. 20, 2016), is likewise misplaced. (*See* Habeas Reply at 19.) In the portion of *Long* that he cites, the question was whether a constitutional claim that was "embedded" in the petitioner's claim for ineffective assistance of appellate counsel had been fairly presented to the Illinois courts, even though the petitioner had not asserted it as a stand-alone claim. *Long*, 809 F.3d at 308. The court determined that the embedded claim had been fairly presented because the petitioner had discussed the facts and legal principles pertinent to it through his presentation of the ineffective assistance claim—*and* had done so at every level of post-conviction review. *See id.* at 308-09 (citing *Malone v. Walls*, 538 F.3d 744, 754-55 (7th Cir. 2008) (similar)). For the reasons already

discussed, Petitioner clearly did not present any ineffective assistance claim, or any constitutional claim embedded therein, at every level of post-conviction review. Nor is there any indication that the court in *Long* treated the petitioner's *pro se* post-conviction petition as the "operative" brief at every level of post-conviction appeal, as Petitioner seems to invite this court to do. *Long*, 809 F.3d at 309; *see* Habeas Reply at 19. The court in *Long* simply noted that because appointed post-conviction counsel did not amend the petitioner's self-drafted petition, the self-drafted petition was the "operative" brief at the first stage of review and should be interpreted generously. *Long*, 809 F.3d at 309. There was no dispute that the petitioner re-raised the relevant claim from his self-drafted petition at each level of post-conviction appeal. *See id.*

Petitioner next observes that "procedural default is considered an affirmative defense to a habeas corpus claim that the State must raise and preserve to avoid waiver." (Habeas Reply at 26 (citing *Kaczmarek v. Rednour*, 627 F.3d 586, 591-92 (7th Cir. 2010)). True, but Petitioner does not—and could not—argue that Respondent failed to preserve the issue. Indeed, procedural default is the centerpiece of the Response.

The court concludes that Petitioner has not asserted any of his federal claims "through one complete round of state court review, either on direct review or in post-conviction proceedings." *McGhee*, 900 F.3d at 854. The claims are procedurally defaulted. *See, e.g.*, *O'Sullivan*, 526 U.S. at 844-45; *Snow*, 880 F.3d at 864.

**B.    Excuse of Procedural Default**

**1.    Ineffective Assistance of Trial Counsel**

If his ineffective-assistance-of-trial-counsel claim is procedurally defaulted, Petitioner urges the court to excuse default for several reasons. Each is unavailing.

First, Petitioner contends that trial counsel's ineffectiveness forced him to file several *Brady* motions *pro se*, and that "the negligence should not be weighed to [him]." (Habeas Petition at 51.) The court interprets this as an argument that trial counsel's ineffectiveness supplies cause for the procedural default of Petitioner's claim that the prosecutor failed to disclose exculpatory

evidence. "Constitutionally ineffective assistance of counsel can excuse a procedural default," *Oaks v. Pfister*, 863 F.3d 723, 726 (7th Cir. 2017), but "a claim of ineffective assistance [must be] presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986); *see also Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009) ("[T]he assertion of ineffective assistance as a cause to excuse procedural default in a § 2254 petition, is, itself, a constitutional claim that must have been raised before the state court or be procedurally defaulted." (internal quotation marks omitted)). As the court has already explained, Petitioner procedurally defaulted his claim that trial counsel was ineffective by failing to present it through the one complete round of state-court proceedings. Trial counsel's alleged ineffectiveness, therefore, cannot establish cause for the procedural default of Petitioner's *Brady* claim.

Next, Petitioner faults appellate counsel for procedurally defaulting the claims for ineffective assistance of trial counsel that Petitioner presented in his *pro se* motion for a new trial. (*See* Habeas Reply at 11.) But the claim of ineffective assistance of appellate counsel is itself procedurally defaulted. Thus, appellate counsel's alleged ineffectiveness cannot establish cause for the procedural default of Petitioner's ineffective assistance of trial counsel claims.

Finally, because Petitioner had no constitutional right to counsel for his post-conviction collateral attack, *see, e.g.*, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), the procedural default of his ineffective assistance of trial and appellate counsel claims cannot be excused on the ground that his post-conviction counsel failed to preserve them. *See, e.g.*, *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017) ("An attorney error does not qualify as 'cause' to excuse a procedural default unless the error amounted to constitutionally ineffective assistance of counsel. Because a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default." (citing *Coleman*, 501 U.S. at 756-57)); *see also, e.g.*, *Oaks*, 863 F.3d at 726 (same); *Szabo v. Walls*, 313 F.3d 392, 397 (7th Cir. 2002) ("[I]neffective assistance of post-conviction

counsel does not supply 'cause' for the cause-and-prejudice formula under which federal courts sometimes entertain claims that were not properly presented to the state courts.").

There is a narrow exception to this rule, but this case does not fall within it. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court addressed a situation in which state law precluded prisoners from raising ineffective assistance of trial counsel claims on direct appeal, instead requiring them to raise such claims for the first time in state collateral review. The Supreme Court held that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17. In *Trevino v. Thaler*, 569 U.S. 413 (2003), the Supreme Court extended the *Martinez* rule to apply where a state's procedural system technically permits a defendant to raise an ineffective assistance of trial counsel claim on direct appeal, but "as a matter of its structure, design, and operation" fails to give "most defendants a meaningful opportunity" to do so. *Id.* at 428.

Petitioner argues that the procedural default of his ineffective assistance of trial counsel claims should be excused under the *Martinez-Trevino* rule because he had ineffective counsel during his initial-review state collateral proceeding. (*See* Habeas Reply at 12.) Petitioner notes that he raised numerous federal claims in his *pro se* post-conviction petitions—including claims of ineffective assistance of trial and appellate counsel—and contends that he supplied the operative facts and controlling law governing each claim. He then asserts that at the evidentiary hearing on initial review, Attorney Weil failed to mention (1) Petitioner's claims for ineffective assistance of trial and appellate counsel and (2) Petitioner's *Brady* claims. (*See id.* at 15-16.) According to Petitioner, therefore, this court may properly review the merits of those claims.

The Seventh Circuit's decision in *Crutchfield*, which was decided after Petitioner's habeas application was fully briefed, forecloses this result. There, the court "decline[d] to extend the *Martinez-Trevino* exception to Illinois prisoners" after determining that "Illinois law gives prisoners

33

a meaningful opportunity to litigate claims of ineffective assistance of trial counsel on direct review." 910 F.3d at 978. The Illinois Supreme Court has neither discouraged defendants from raising such claims on direct review nor "expressed a preference for reserving these claims for collateral review." *Id.* at 976. In fact, "[i]f the claim relies solely on the existing record," a prisoner must bring it on direct appeal to avoid forfeiture. *Id.* "That rule is the opposite of the default rule in Texas," which was the jurisdiction at issue in *Trevino*, and in Indiana, a jurisdiction in which the Seventh Circuit has applied the *Martinez-Trevino* rule. *Id.* Additionally, an Illinois prisoner can expand the record on ineffective assistance of trial counsel before collateral proceedings through a motion for a new trial or a *Krankel* motion, both of which provide opportunities for evidentiary hearings. *See id.* at 977. A *Krankel* motion, for example, permits a defendant acting *pro se* to present his ineffective assistance claims to the trial court, either in oral argument or in writing. *See id.* As already discussed, the trial court must then examine the underlying facts to determine whether the allegations show a possibility that the attorney neglected the defendant's case. *See id.* If they do, the court must appoint counsel to help the defendant present the *Strickland* claims at the evidentiary hearing. *See id.* Moreover, there is no deadline for trial courts to resolve either type of post-trial motion, which lends flexibility to the process. *Id.* at 977-78.

The Seventh Circuit determined that these features of Illinois law distinguish it from that of jurisdictions whose practice moved the Supreme Court to expand the *Martinez* exception in *Trevino*, and moved the Seventh Circuit to apply the *Martinez-Trevino* rule in cases involving Indiana and federal prisoners. *See id.* at 977-78; *cf. Nash v. Hepp*, 740 F.3d 1075, 1079 (7th Cir. 2014) (declining to excuse a Wisconsin prisoner's procedural default under *Martinez* or *Trevino* because "Wisconsin law expressly allows—indeed, in most cases requires—defendants to raise claims of ineffective assistance of trial counsel as part of a consolidated and counseled *direct* appeal, and provides an opportunity to develop an expanded record").

Petitioner contends that the state courts were the "external impediment" preventing him from presenting his ineffective assistance of trial counsel claims. (Habeas Reply at 18; *see*

*Thompkins*, 698 F.3d at 987.) The court interprets this as an argument that although Illinois law gives prisoners a "meaningful opportunity" to raise ineffective assistance of trial claims on direct appeal, *Trevino*, 569 U.S. at 428, the state courts in Petitioner's case made it impossible for him to do so. Specifically, Petitioner complains that although he presented his ineffective assistance claims "in detail" in his *pro se* motion for a new trial, the "bias[ed]" and "prejudic[ed]" trial court refused to consider them. (Habeas Reply at 9-12.) Petitioner also argues that, around the same time, the trial court refused to consider a complaint he lodged against trial counsel in the Illinois Attorney Registration and Disciplinary Commission. (*See id.* at 9-10.) The appellate court agreed with the trial court that "trial counsel vigorously and ably represented the Petitioner," and Petitioner contends that was error. (*Id.* at 11.)

In effect, Petitioner accuses the state courts of flouting their *Krankel* obligations. This is an argument that the state courts violated state law, and it is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a) (federal courts may grant a writ of habeas corpus only when the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States"); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[F]ederal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted)); *United States ex rel. Cummings v. Rednour*, No. 08 C 5723, 2010 WL 4340448, at *6 (N.D. Ill. Oct. 10, 2010) (dismissing the petitioner's claim that the trial court, in violation of *Krankel*, inadequately examined his ineffective assistance claim). The court is not aware of any authority providing that an Illinois prisoner can bootstrap a *Krankel* claim into a cause argument under the *Martinez-Trevino* rule. *Crutchfield*, for example, which discusses the *Krankel* process in detail, says no such thing. *See* 910 F.3d at 977-78. And *Geders v. United States*, 425 U.S. 80 (1976), which Petitioner cites (*see* Habeas Reply at 18), has nothing to do with *Krankel*. That case concerned a federal judge's order that hindered a defendant's federal constitutional right to counsel, and the issue was not before the court on habeas review. *See Geders*, 425 U.S. at 91.

Finally, to the extent Petitioner argues that his appointed counsel's ineffective

performance *after* initial-review collateral proceedings supplies cause under the *Martinez-Trevino* exception, he is incorrect. *See Martinez*, 566 U.S. at 16 (emphasizing that the Court's holding "does not concern attorney errors in . . . appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts"). Petitioner has not satisfied the cause requirement for excusing the procedural default of his ineffective assistance of trial counsel claims, nor for the procedural default of the constitutional claims embedded therein.

### 2. Suggestive Lineup and Sufficiency of Evidence Claims

Petitioner contends that the ineffectiveness of his appellate counsel on direct appeal should excuse the procedural default of two constitutional claims: that (1) the trial court erred in denying his motion to suppress the allegedly suggestive lineup identification, and (2) Petitioner was not proven guilty beyond a reasonable doubt. (Habeas Petition at 19-24.) This argument fails for many of the reasons just discussed.

First, although a court may excuse a procedural default due to an attorney error of constitutional significance, *see Oaks*, 863 F.3d at 726, a petitioner must fully and fairly present an ineffective assistance claim to state courts before he can use it to establish cause for the default. *See Carpenter*, 529 U.S. at 451-52; *Murray*, 477 U.S. at 489; *Gaetz*, 565 F.3d at 352. Because, as already explained, the claim of ineffective assistance of appellate counsel claim is itself procedurally defaulted, that claim cannot establish "cause" for the procedural default of any embedded constitutional claim. The *Martinez-Trevino* exception does not salvage Petitioner's claims, either, because it does not excuse the procedural default of a claim for ineffective assistance of *appellate* counsel. *See Davila*, 137 S. Ct. at 2063; *see also id.* at 2066 (offering numerous reasons for declining to extend the exception to such claims, including that doing so could risk replacing "the rule of *Coleman* with the exception of *Martinez*"; the "Constitution twice guarantees the right to a criminal trial . . . but does not guarantee the right to an appeal at all"; and, relatedly, a trial "is where the stakes for the defendant are highest"). The court concludes

that Petitioner has not satisfied the cause requirement for excusing the procedural default of his suggestive-lineup and sufficiency-of-the-evidence claims. The court reaches the same conclusion for the remaining federal habeas claims that are not embedded in an ineffective assistance claim. Interpreting the Petition liberally, those are: the police improperly executed the search warrant; Petitioner's arrest was illegal; and the trial court abused its discretion by allowing improper aggravation evidence at sentencing. Although Petitioner asserted those claims in his *pro se* post-conviction petitions, he did not fairly present them through one complete round of state review. Petitioner offers no excuse for the procedural default of those claims, and the court has found none.

### 3. Fundamental Miscarriage of Justice

Petitioner has not asserted that the court should excuse the procedural defaults in order to avoid a "fundamental miscarriage of justice." *Thomas*, 822 F.3d at 386 (quoting *Coleman*, 501 U.S. at 750). Had Petitioner pressed this argument, he would not have succeeded. The fundamental miscarriage of justice standard presents "an extremely high bar." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013). It can excuse procedural default only if Petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015) (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)). Petitioner must show that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Gladney*, 799 F.3d at 896 (quoting *House v. Bell*, 547 U.S. 518, 537 (2006); *see also Schlup*, 513 U.S. at 327. Petitioner has not presented any new evidence to this court, let alone strong evidence of this nature. Thus, the procedural defaults are not excused.

Though not necessary to this conclusion, the court notes that the record evidence provides ample support for the verdict. Rose B. positively identified Petitioner from a lineup. The DNA profile of the semen stains on Rose B.'s pantyhose matched Petitioner's DNA profile. Rose B.

claimed that she noticed a bleeding cut on her face during the attack; a car fitting Rose B.'s description was registered to Petitioner's home; and blood stains found in that car matched Rose B.'s blood. That evidence would be compelling even without fingerprint evidence. Petitioner makes much of the contention that latent fingerprints from the crime scene "initially could not be matched through the [AFIS]" (Habeas Petition at 23), but an expert in latent print identification later made a "tentative" conclusion that the prints in fact were his. (2002 Direct Appeal Order at 2.) Thereafter, a forensic scientist determined that "nine suitable latent prints taken from Rose B.'s car" were "prints made by" Petitioner. (*Id.*)

Finally, even if the court determined that the procedural defaults were excused and proceeded to the merits of Petitioner's claims, Petitioner would be hard-pressed to prevail on any of them. Several examples suffice. Petitioner's contention that trial counsel should have presented evidence of what he calls the "negative" fingerprint result has very little promise in light of the expert fingerprint assessments just discussed and the other incriminating forensic evidence. Petitioner's argument that trial counsel should have requested independent DNA testing using different methods also carries little weight considering the strength of the matches that the State's testing produced. (*See* 2017 Forensic Testing Appellate Order ¶¶ 16-17.) The fact that DNA testing methodologies may have evolved since the time of trial, moreover, says little about the strength of the DNA matches in Petitioner's case. Turning to the *Brady* claims, Petitioner appears to rely solely on speculation in claiming that the State withheld or destroyed evidence, including Rose B.'s clothing. And although Petitioner argues that trial counsel should have questioned all jurors about the allegation that one juror read a prejudicial newspaper article, it is unclear what that would have accomplished, as the juror who read the article testified that she read it after the jury returned the verdict.

## CONCLUSION

For the foregoing reasons, the court denies Petitioner Nathan Antoine's Petition for a Writ

of Habeas Corpus [13].  Because jurists of reason would not find the procedural default question

debatable, the court declines to certify any issues for appeal under 28 U.S.C. § 2253(c).

ENTER:

Dated: September 21, 2020

_____
REBECCA R. PALLMEYER
United States District Judge